UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JAMES THOMPSON, LEE FITCH, CHRIS HARRISON, JONATHAN NELSON, WILLIAM PURVIANCE, CHRISTOPHER LOVE, and FERNANDO CHAVEZ, | § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:15-CV-0758-B |
| INTERNATIONAL PAPER COMPANY, UNITED STEELWORKERS, and UNITED STEELWORKERS LOCAL UNION NO. 895, | § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

      This case requires the Court to interpret a collective-bargaining agreement to determine whether the agreement entitles the plaintiffs to paid lunch breaks. Section 301 of the Labor Management Relations Act provides a cause of action employees can use against employers that breach collective-bargaining agreements and unions that neglect their duty to represent employees fairly. The plaintiffs argue that, by not providing paid lunch breaks, International Paper has breached the 2010 collective-bargaining agreement (CBA) that sets the terms of the plaintiffs' employment. The plaintiffs claim also that, by taking International Paper's side in this dispute, their union[1] breached its duty of fair representation. Although the CBA's text requires paid lunch breaks,

---

[1] There are two union defendants in this case: a national organization, United Steelworkers, and a local organization, United Steelworkers Local Union No. 895. The Court will refer the these union defendants as "the Union."

International Paper and the Union contend that the paid-lunch language is merely a typo—a mutual mistake that never entitled the plaintiffs to paid lunch breaks. Before the Court are the defendants' motions for summary judgment. Because fact issues remain regarding whether International Paper breached the agreement and whether the Union breached its duty of fair representation, the Court **DENIES** the defendants' motions.

I.

BACKGROUND

A.  *Factual History*[2]

The plaintiffs are "nonproduction" employees working "three shift operations" at International Paper's Grand Prairie, Texas plant. Doc. 40, Pls.' 1st Am. Compl., ¶¶ 3–9, 18–32. A collective-bargaining agreement sets the terms of the plaintiffs' employment. The now-superceded 2005 agreement gave the plaintiffs only unpaid lunch breaks, stating, "Non-production employees on a three (3) shift operations [sic] will have a thirty (30) minute **unpaid** lunch." Doc. 98-1, App'x to Union's Mot. Summ. J., 28 (emphasis added).  But the now-effective 2010 collective-bargaining agreement (the CBA) states, "Non-production employees on a three (3) shift operations [sic] will have a thirty (30) minute **paid** lunch."[3] *Id.* at 72 (emphasis added). But despite the text of the CBA, International continued its practice of not paying the plaintiffs for their lunch breaks. *Id.* at 4, 98.

---

[2] This factual history is drawn from the plaintiffs' First Amended Complaint and the parties' briefing on the pending motions for summary judgment. The Court has noted when facts are in dispute.

[3] The defendants have created some confusion about the document the plaintiffs refer to as the CBA. The Union says, "Following the proofreading of the draft 2010 CBA, the Company distributed copies of the new 2010 CBA (printed CBA) to the hourly employees." The plaintiffs rely on this "printed" CBA. But neither of the defendants refers to a writing memorializing their agreement that is both in effect and does not require paid lunch breaks. Thus, the Court will refer to the document on which the plaintiffs rely as the "CBA."

The plaintiffs set this dispute in motion in October 2014 when they discovered the CBA's paid-lunch language. Doc. 104-1, App'x to Pls' Consolidated Resp., 3. After learning about the paid-lunch language, the plaintiff Chris Harrison complained to United Steelworkers Local Union No. 895 representative, Larry Hughes, about International Paper's failure to provide paid lunch breaks. Doc. 98-1, App'x to Union's Mot. Summ. J., 100. Hughes then filed with International Paper a grievance requesting paid lunch breaks and back pay for unpaid lunch breaks. *Id.* at 100, 169. International Paper's plant manager reviewed the grievance and CBA and began paying nonproduction employees for their lunch breaks. Doc. 101-3, App'x to International Paper's Mot. Summ. J., 5. Hughes also discussed the grievance with the United Steel Workers' local lead negotiator and spokesperson, John Dykes. Doc. 98-1, App'x to Union's Mot. Summ. J., 98. Both Dykes and Hughes participated in the negotiations that resulted in the 2010 CBA but, in spite of the 2010 CBA's language requiring paid lunches, neither could remember the Union bargaining for paid lunches for the plaintiffs in the negotiations preceding the current CBA. *Id.* at 98–100. Dykes and Hughes thought "paid lunch" must have been included in the CBA by mistake. *Id.*

Subsequently, while the plaintiffs' grievance was pending, the plaintiffs filed their original complaint in this lawsuit, alleging that International Paper violated the Fair Labor Standards Act (FLSA). Doc. 1, Pls.' Orig. Compl., 1–2. Because the plaintiffs sought relief under the FLSA, they moved to certify a class of similarly situated employees at International Paper's Grand Prairie plant to whom International Paper failed to provide paid lunch breaks in the three years before the plaintiffs filed this suit. Doc. 15, Pls' Mot. Cond. Class Cert., 1.

On March 30, 2015, after the plaintiffs filed this lawsuit, International Paper denied the plaintiffs' grievance, claiming that it never agreed to pay the plaintiffs for their lunch breaks and that

the CBA included paid lunches because of a typographical error. Doc. 98-1, App'x to Union's Mot. Summ. J., 9, 89, 101. That same day, on Dykes's instructions, Hughes accepted International Paper's explanation and withdrew the grievance. *Id.* at 101. The following month, International Paper and the Union signed a memorandum of understanding (MOU) in which they agreed the CBA never entitled nonproduction employees to paid lunch breaks. *Id.* at 95. International Paper stopped paying nonproduction employees for their lunch breaks around August 7, 2015. Doc. 101-1, App'x to International Paper's Mot. Summ. J., Ex. A, 2–3.

After withdrawing the grievance, Hughes met with the plaintiffs. Doc. 104-1, App'x to Pls' Consolidated Resp., 4, 7, 19. Three of the plaintiffs claim Hughes made statements at that meeting indicating that the Union abandoned the grievance because many of them were not union members. *Id.* Two aver that Hughes said, "[I]f [the plainitffs] had been union members things could have gone differently." *Id.* at 4, 7. And the plaintiff Christopher Love asserts that Hughes "often made the statement if y'all were in the Union they might help. But since we were not, the union was not really gonna waste time with it." *Id.* at 19.

B.   *Procedural History*

Although the plaintiffs originally pleaded an FLSA claim, their case morphed into a Labor Management Relations Act (LMRA) case because their claim asks the Court to enforce a collective-bargaining agreement. Doc. 39, Order, 5–6. The plaintiffs now allege that International Paper and the Union violated § 301 of the LMRA. 29 U.S.C. § 185; Doc. 40, Pls.' 1st Am. Compl., 1–2.

After the plaintiffs filed their First Amended Complaint, International Paper moved for judgment on the pleadings or, in the alternative, for summary judgment. Doc. 42, International Paper's Mot. J. on Pleadings, 1. International Paper argued that it and the Union made a mutual

mistake that caused the CBA to include paid lunch breaks erroneously and therefore that International Paper need not pay the plaintiffs for their lunch breaks. *Id.* Judge Solis denied International Paper's motion, noting that "although [International Paper] may have a plausible defense that a mutual mistake occurred," there was at least some "evidence that the actual intent of the CBA [was] different than what the Memorandum of Understanding states." Doc. 49, Order, 6–7.

The case was then reassigned to this Court, Doc. 50., Special Order No. 3-304, and the Court allowed the defendants to file another round of summary-judgment motions, Doc. 65, Electronic Order. The Court initially denied these new motions because the Court afforded the plaintiffs the opportunity to withdraw deemed admissions on which the motions were partially based. Doc. 95, Order, 1. International Paper and the Union again moved for summary judgment. Doc. 96, Union's Mot. Summ. J.; Doc. 99, International Paper's Mot. Summ. J.

## II.

## LEGAL STANDARD

Courts must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007). And a fact "is 'material' if its resolution could affect the outcome of the action." *Id.*

The summary-judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). So the movant must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions

on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the movant has produced evidence on an element or claim or alleged the non-movant has no evidence, the non-movant must "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports [its] claim" to show that a fact issue exists. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). And though the Court views evidence in the light most favorable to the non-movant when determining whether a genuine issue exists, *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000), mere "metaphysical doubt as to material facts," "conclusory allegations," "unsubstantiated assertions," or a mere "scintilla of evidence" will not save a non-movant from summary judgment, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (internal citations and quotation marks omitted).

In some scenarios summary judgment is usually inappropriate. One such scenario is when a party's state of mind is at issue. *Nat'l Labor Relations Bd. v. Smith*, 403 F.2d 889, 895 (5th Cir. 1968).

### III.
### ANALYSIS

The plaintiffs claim International Paper and the Union violated § 301 of the LMRA, which authorizes suits for violations of collective-bargaining agreements and creates federal jurisdiction over such suits. 29 U.S.C. § 185; Doc. 40, Pls.' 1st Am. Compl., 1. To prevail in a § 301 suit, an employee "must prove . . . that the employer's action violated the terms of the collective-bargaining agreement and that the union breached its duty of fair representation."[4] *Chauffeurs, Teamsters & Helpers, Local*

---

[4] An employee must usually exhaust the applicable collective-bargaining agreement's grievance process before suing her employer for breach of a collective-bargaining agreement. *Blanks v. United*

*No. 391 v. Terry*, 494 U.S. 558, 564 (1990). A fact issue must exist on both elements for the plaintiffs to survive the defendants' motions for summary judgment.

A.	*Breach of the Collective Bargaining Agreement by International Paper*

A fact issue exists as to whether International Paper breached the CBA. Federal common law governs courts' interpretations of collective-bargaining agreements. *Allis-Chambers Corp. v. Lueck*, 471 U.S. 202, 209–10 (1985). Courts may incorporate state-law contract principles into the body of federal common law that guides courts in interpreting collective-bargaining agreements, but state law is not an independant source of private rights in LMRA cases. *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 457 (1957).

When interpreting contracts, courts generally give effect to contracts' unambiguous terms. *Interstate Contracting Corp. v. City of Dall.*, 407 F.3d 708, 712 (5th Cir. 2005). And although courts refuse to hear parole evidence concerning the meaning of unambiguous terms, courts will hear parole evidence presented to establish mutual mistake—which occurs if a term, even an unambiguous one, is included in a contract because of a mistake made by both parties to the contract. *Richard v. Anadarko Petroleum Corp*, 850 F.3d 701, 708 (5th Cir. 2017) (applying maritime law); *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 408 (5th Cir. 2012) (applying Texas law). A common scenario in which the mutual-mistake doctrine applies is when the parties to a contract agree to one thing and the writing expressing the parties' agreement reflects something other than the parties' agreement. *Rocanville Corp. v. Nat. Gas Pipeline Co. of Am.*, 823 F.2d 92, 94

---

*Aerospace Workers UAW Local 848*, 837 F. Supp. 2d 609, 614 (N.D. Tex. 2011). But when as here the employee alleges the Union acted "in such a discriminatory, dishonest, arbitrary or perfunctory fashion as to breach its duty of fair representation . . . [the] employee may bring suit against both the employer and the Union, notwithstanding the outcome or finality of the grievance or arbitration proceeding." *Id.*

(5th Cir. 1987); Restatement (Second) of Contracts § 155 (Am. Law Inst. 1981). When a party pleads mutual mistake, a court must determine "whether the disputed provision result[ed] from an agreement between the parties." *Tech. Automation Servs. Corp.*, 673 F.3d at 408. The party pleading mutual mistake bears the burden of proof to establish mutual mistake. *In Re Contractor Tech., Ltd.*, 376 B.R. 156, 159 (S.D. Tex. 2007).

The defendants have not conclusively established mutual mistake. To establish that the writing included paid lunches because of a mutual mistake, the defendants present two categories of evidence. The first category includes evidence from before the plaintiffs filed their grievance:

- The 2005 collective-bargaining agreement provided for unpaid lunches for nonproduction employees. Doc. 98-1, App'x to Union's Mot. Summ. J., 28.

- The 2010 Memorandum of Agreement that preceded the CBA contained all proposed changes to the 2005 agreement but did not mention paid lunches for nonproduction employees. Doc. 101-1, App'x to International Paper's Mot. Summ. J., 1–2, 26.

- John Dykes, the Union's lead negotiator in the talks preceding the CBA, state in their declarations that there was no agreement to change the 2005 provision providing for unpaid lunches and that the provision was to remain the same in the CBA. Doc. 98-1, App'x to Union's Mot. Summ. J., 3–4.

- Larry Hughes, who also negotiated on the Union's behalf, testified that there was no agreement to change the 2005 provision providing for unpaid lunches and that the provision was to remain the same in the CBA. Doc. 98-1, App'x to Union's Mot. Summ. J., 99.

- International Paper prepared a draft of the CBA, and Dykes and Hughes proofread the agreement but discovered no change from the 2005 agreement's unpaid-lunch provision. *Id.*

at 6, 99.

- An International Paper administrative assistant retyped the agreement but incorrectly typed "paid lunches" into the CBA. Doc. 101-1, App'x to International Paper's Mot. Summ. J., 3.

- The CBA distributed to hourly employees provided for paid lunches.72.

- Before Hughes filed a grievance on the plaintiffs' behalf in October 2014, International Paper did not pay nonproduction employees for their lunch breaks. *Id.* at 4, 98.

The defendants' second category includes evidence from after the grievance was filed:

- Dykes, who was responsible for reviewing and evaluating grievances, says he received the grievance from Hughes and concluded that the paid-lunch language in the CBA was a mistake because International Paper and the Union had not agreed to provide nonproduction employees paid lunch breaks. *Id.* at 7–8.

- International Paper denied the grievance, claiming that the paid-lunch language was a mistake. *Id.* at 89.

- On March 30, 2015, Hughes withdrew the grievance. *Id.* at 89, 101.

- In April 2015, International Paper and the Union signed a Memorandum of Understanding that said the CBA never required paid lunch breaks. *Id.* at 95.

- The Union did not withdraw the grievance and agree to the MOU because the plaintiffs were not union members. *Id.* at 10–11.

The plaintiffs respond with evidence of their own. They highlight that

- Hughes stated that changes can be made to an old CBA. Doc. 104-1, App'x to Pls.' Consolidated Resp., 34.

- After the plaintiffs filed their grievance, International Paper began paying nonproduction

employees for their lunch breaks, which the plaintiffs say International Paper would not have done had the inclusion of paid lunches in the CBA so clearly been in error. Doc. 98-1, App'x to Union's Mot. Summ. J., 100.

- The defendants did not sign the MOU on which they now rely until after the plaintiffs filed this lawsuit, which, the plaintiffs argue, shows the defendants are colluding to avoid the CBA. *Id.* at 95.

- The Union did not withdraw the grievance until after the plaintiffs filed this lawsuit, which, according to the plaintiffs, also shows the defendants are colluding to avoid the CBA. *Id.* at 89, 101.

- Three of the plaintiffs claim Hughes told them things may have been handled differently had they been Union members, which, the plaintiffs contend, shows the Union sided with International Paper for reasons other than that the inclusion of paid lunches in the CBA was a mutual mistake. Doc. 104-1, App'x to Pls.' Consolidated Resp., 4, 7, 19.

The plaintiffs' evidence creates a fact issue. A jury could reasonably infer that International Paper would not have paid for the lunch breaks had it not intended the CBA to provide for paid lunch breaks. And a jury could reasonably conclude based on the facts that the defendants executed the MOU and the Union withdrew its grievance during this lawsuit, combined with Hughes' alleged statements to the plaintiffs, that the defendants are colluding to avoid paid lunch breaks rather than that the CBA included paid lunch breaks because of a mutual mistake.

The defendants respond that Hughes' statement, if he made it, is immaterial because Hughes did not have the final say whether to appeal International Paper's denial of the grievance. Doc. 105, Union's Mot. Summ. J. Rep., 6. But the defendants fail to consider that a jury could reasonably infer

that Hughes' alleged statements could reflect the Union's views. Indeed, in the alleged statements Hughes explained what the Union did rather than any decision he made. A jury could reasonably find based on Hughes' alleged statements that the Union abandoned the grievance because the plaintiffs were not union members.

So a fact issue remains as to whether International Paper breached the 2010 CBA. Did a mutual mistake—a typo—in 2010 cause the 2010 CBA to include paid lunch break erroneously? Or are the defendants colluding? This question must be resolved at trial—but only if the plaintiffs create a fact issue on the fair-representation prong of its claim.

B.   *Union's Duty of Fair Representation*

Based on evidence already discussed, the Court finds that a fact issue exists also as to whether the Union breached its duty of fair representation. Because a union is the exclusive bargaining representative for employees in a collective-bargaining unit, the union must fairly represent the members of the unit. *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). A union must therefore "serve the interests of all members without hostility or discrimination toward any . . . exercise its discretion with complete good faith and honesty, and . . . avoid arbitrary conduct." *Id.* The Union's duty applies to both union members and non-union members. *Roscello v. Southwest Airlines Co.*, 726 F.2d 217, 224 (5th Cir. 1984). And a union must comply with its "duty both in bargaining with the employer and in its enforcement of the resulting collective-bargaining agreement." *Terry*, 494 U.S. at 563.

A union breaches the duty of fair representation "only when [its] conduct toward a member of the collective-bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190. Courts diagnose arbitrariness, discrimination, and bad faith separately; breach occurs if any of the three infect the union's action. *McCall v. Sw. Airlines*, 661 F. Supp. 2d 647, 654 (N.D. Tex. 2009).

Conduct is "arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Airline Pilots Ass'n. Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (Internal quotes and citations omitted). A union acts in good faith if it bases its decision on "wholly relevant considerations" but in bad faith if it considers "capricious and arbitrary factors." *Humphrey v. Moore*, 375 U.S. 335, 350 (1964). Thus, "[b]ad faith occurs when a union acts with a 'motive to harm' a particular group, and turns on the subjective motivation of the union officials." *Carr v. Airline Pilots Ass'n Int'l*, 866 F.3d 597, 602 (5th Cir. 2017). The bad-faith standard is demanding and only sufficiently egregious union conduct meets it. *Id.* And as to discrimination, "A union violates its duty of fair representation [among other ways] by discriminating between members of a bargaining unit on the basis of the person's status as a nonmember of the union." *Roscello*, 726 F.2d at 224.

1. Bad Faith

A fact issue exists as to whether the Union acted in bad faith by withdrawing the plaintiffs' grievance and signing the MOU. The defendants present evidence that the Union withdrew the grievance and signed the MOU because it believed the CBA included "paid lunches" erroneously. The Court summarized this evidence above and will not rehash it here.

The first hurdle the defendants must overcome is courts' tendency to avoid summary judgment when a party's state of mind is at issue. *Smith*, 403 F.2d at 895. Because the plaintiffs allege that the Union acted in bad faith, the Union's state of mind is at issue. Indeed, the plaintiffs' bad-faith argument turns on the "subjective motivation of Union officials." *Carr*, 866 F.3d at 602. So the Court will grant summary judgment for the defendants only if the record clearly establishes that the Union acted in good faith when it withdrew the plaintiffs' grievance.

But the defendants' evidence does not clearly establish good faith. The plaintiffs' evidence indicates that the Union may have abandoned the grievance because many of the plaintiffs were not union members, not because it believed the CBA contained a typo. Three of the seven plaintiffs claim Hughes told them at a meeting of those affected by the Union's decision to withdraw the grievance that "if [they] had been union members things could have gone differently." Doc. 104-1, App'x to Pls.' Consolidated Resp., 4, 7, 19. And the plaintiff Christopher Love asserts that Hughes "often made the statement if y'all were in the Union they might help. But since we were not, the union was not really gonna waste time with it." *Id.* at 19. Because Hughes was a Union representative, his statement indicates that the Union could have dropped the plaintiffs' grievance because many of them—all but one—were not union members. That the Union withdrew the grievance even though the text of the agreement clearly entitled the plaintiffs to paid lunches also supports the plaintiff's argument that the Union acted in bad faith by withdrawing the grievance. Withdrawing the grievance because the plaintiffs were not union members would have been bad faith on the union's part because the action would have been taken "with a motive to harm" non-union members. *Carr*, 866 F.3d at 602. Ultimately, a jury could reasonably infer based on the apparent strength of the plaintiffs' grievance and Hughes' alleged statements—if the jury believes he actually made those statements—that the Union withdrew the grievance and signed the MOU in bad faith in breach of its duty of fair representation.

2.  Discrimination

A fact issue exists regarding whether the Union discriminated against the plaintiffs. "A union violates its duty of fair representation by discriminating between members of a bargaining unit on the basis of the person's status as a nonmember of the union." *Roscello*, 726 F.2d at 224. As discussed

above, the plaintiffs evidence creates a fact issue as to whether the Union abandoned the plaintiffs' grievance because many of the plaintiffs were not union members. Thus, a jury could reasonably infer based on the plaintiffs' evidence that the Union impermissibly discriminated against the plaintiffs.

### 3. Arbitrariness

A fact issue exists also regarding whether the Union acted arbitrarily by withdrawing the grievance and signing the MOU. The defendants contend that their decision to withdraw the grievance was not arbitrary because the grievance lacked merit. The defendants say the grievance lacked merit because the CBA required paid lunch breaks only because of a mutual mistake. But a fact issue remains as to whether the paid-lunch language in the CBA resulted from a mutual mistake. Thus, a fact issue remains also as to whether the Union acted arbitrarily by withdrawing the grievance.

### IV.

### CONCLUSION

Because fact issues remain regarding both prongs of the plaintiffs' § 301 claim—that is whether International Paper breached the CBA and whether the Union breached its duty of fair representation—the Court **DENIES** the defendants' motions for summary judgment.[5]

**SO ORDERED.**

---

[5] The Union moved also to strike part of the plaintiffs' summary-judgment evidence. Having avoided relying on the challenged evidence to decide the defendants' motions for summary judgment, the Court declines to rule on the Union's motion to strike.

SIGNED: October 19, 2017.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE